IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CRYSTAL GREGORY, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) No. 02-04157-CV-C-SOW |
| DILLARD'S, INC., | ) |
| Defendant. | ) |

## ORDER

Before the Court are defendant Dillard's, Inc.'s Motion for Summary Judgment Against Plaintiffs Alberta and Carla Turner (Doc. # 68), Motion for Summary Judgment Against Plaintiff Crystal Gregory (Doc. # 70), Motion to Strike Affidavit of Theresa Cain (Doc. # 88),[1] Motion to Amend January 3, 2005, Order and to Dismiss Plaintiff Jeff McKinney or in the Alternative for Summary Judgment (Doc. # 161), and Motion for Summary Judgment on the Remaining Claims Asserted by Michael Butler, Deidra Golphin,[2] and Cecilia Young (Doc. # 163). The motions are fully briefed. For the reasons discussed below, Dillard's motion against Alberta and Carla Turner is granted, Dillard's motion against Crystal Gregory is granted, Dillard's motion to strike is denied as moot, Dillard's motion against Jeff McKinney is granted in part and denied in part,[3] and Dillard's

---

[1] The Cain affidavit will not be relied upon by the Court in ruling on the various motions for summary judgment. This failure to rely upon the Cain affidavit is not an endorsement of the arguments contained in Dillard's motion to strike. As will be evident below, the Court simply does not think that the Cain affidavit is relevant for purposes of ruling upon the various motions for summary judgment. Dillard's motion to strike is therefore denied as moot.

[2] Golphin's claims against Dillard's have been dismissed with prejudice. *See* Doc. # 181.

[3] Dillard's has sufficient notice of McKinney's claims and is therefore not prejudiced by the arguable pleading deficiencies in the third amended complaint. Dillard's motion to dismiss is

motion against Michael Butler, Deidra Golphin, and Cecilia Young is granted in part and denied in part.

I.    Background

This lawsuit concerns the following claims: (1) violations of 42 U.S.C. § 1981, and (2) violations of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.065. All of the plaintiffs in this case are African-American. The claims of each plaintiff and the material facts relevant to said claims for purposes of the pending motions are summarized below.

A.    Alberta and Carla Turner

The Turners' claims are based on two[4] incidents at the Dillard's store in Columbia, Missouri. One incident involved only Alberta and occurred during a shopping trip on May 10, 2002. The remaining incident involved both Alberta and her daughter Carla and occurred on a shopping trip during Memorial Day, 2002.

1.    May 10, 2002

On May 10, 2002, Alberta and her daughter Felicia visited Dillard's to purchase shoes. After trying on and purchasing shoes, Alberta went to the cosmetic department to look at and purchase makeup. While at the cosmetic department, Alberta observed a security guard. Alberta does not know if the security guard was already in the cosmetic department or if he entered after she arrived.

therefore denied.

[4] The alleged discriminatory conduct at issue in the Christmas, 2001, incident was not targeted at Alberta. Consequently, the Court will not consider the incident as a separate claim of race discrimination against Alberta.

Alberta also does not know if she was followed in the store on that day. Alberta did testify that she believed she had been followed in Dillard's on a number of prior occasions. The security guard said nothing to Alberta, and there was no exchange of any kind between the security guard and Alberta. Alberta purchased merchandise from the cosmetic department. She then left the store without incident.

### 2. Memorial Day, 2002

On Memorial Day, 2002, Alberta and Carla went to Dillard's to purchase shoes for Alberta's grandchildren, including Carla's daughter. After purchasing some shoes from the shoe department, the grandchildren wanted to look at some clothes on a sale rack. Alberta agreed to stay and browse the clothes. Alberta stayed with one granddaughter while Carla took her daughter to another department to look at clothes for slightly older children. Carla took the shoes that had been purchased, which were inside two large shopping bags.

After arriving at the department, Carla and her daughter picked out some items and went into the fitting room. When they emerged from the fitting room, Carla saw a sales associate and a security guard "hanging" or "laying" on a sale rack. Carla estimated that the sale rack was "10 steps" from the fitting room. The sales associate and security guard were not looking in Carla's direction, but were instead facing and talking to each other. When Carla walked by the sales associate and security guard, neither addressed her. The sales associate, however, looked over at the two bags Carla was carrying, which Carla did take into the fitting room. The security guard did not look over at the bags. The sales associate then walked to her cash register to serve other customers.

Carla left the department she was shopping in and walked toward Alberta in another department. Carla testified that the security guard walked parallel to her in a separate department.

She believed the security guard was following her. Carla and the security guard were separated by an aisle and racks of merchandise. Carla did not make eye contact with or speak to the security guard until she reached her mother. Alberta testified that Carla appeared to be "upset" as she approached her. Carla asked the security guard why he was staring at her. The security guard said nothing in return. Carla then told her mother what had she just happened. As Carla was telling Alberta about the incident, Alberta noticed the security guard in a different department from which her and Carla were standing. Alberta then approached the security guard and said something to him. She cannot remember if he said anything in return. Alberta then decided not to purchase certain merchandise that she and Carla had picked out and to leave the store. As they left the store, Alberta and the sales associate who had been standing by the fitting room had an exchange. Specifically, Alberta indicated to the sales associate that she had just lost several hundred dollars in sales. The sales associate then "snickered" and said, "So? So what?" It appears that the security guard approached them and asked what was going on. The Turners then left the store without further incident.

### B. Crystal Gregory

Gregory's claims are based on three[5] incidents at the Dillard's store in Columbia, Missouri: (1) an incident on February 3, 2001, (2) an incident involving the removal of a security tag on an unspecified date, and (3) an incident on April 7, 2001.

---

[5] The alleged discriminatory conduct at issue in the May 5, 2001, incident was not targeted at Gregory. Consequently, the Court will not consider the incident as a separate claim of race discrimination against Gregory.

1. **February 3, 2001**

On February 3, 2001, Gregory visited Dillard's with her sister to shop for a "dressy" outfit. Gregory and her sister visited two departments and then went to the Ralph Lauren department. After arriving at the Ralph Lauren department, a sales associates named Tracy asked Gregory if she could help her. Gregory responded that she did not need any help. Tracy then began to "follow" Gregory. Gregory did not ask Tracy why she was following her, nor did Tracy make any comments to Gregory during this time. Gregory then selected a pair of pants and entered a fitting room to try on the pants she had selected. When Gregory emerged from the fitting room wearing the pants, she thinks she remembers Tracy had her "arms crossed" and "had her head kind of cocked to one side with this little snicker on her face." It appears that Tracy was inside the general fitting room area. Tracy did not say anything to Gregory. Gregory also observed two officers "leaning on clothing racks" outside of the general fitting room area. Gregory does not know whether Tracy summoned the officers. After observing the pants in the mirror, Gregory returned to the fitting room to remove the pants. Gregory then went to the register to purchase the pants. Tracy began to ring up the sale when Gregory told her, "You know, I'm not buying these, but I do want to speak to your manager." Tracy called the manager and Gregory spoke to the manager. Gregory's sister then attempted to persuade Gregory to purchase the pants. Gregory refused to purchase the pants. Gregory and her sister then left the store without incident.

2. **Security Tag Incident**

Gregory had purchased a bedding set from a Burlington Coat Factory store. The employee at the Burlington Coat Factory store did not remove the security tag from the merchandise. A friend of Gregory's who worked at Dillard's told Gregory that she could remove the security tag if Gregory

came by the store. On an unspecified date, Gregory went to the Dillard's store to have the security tag removed. The bedding set was in a plastic bag. Gregory also brought the Burlington Coat Factory store receipt. The Dillard's employee Gregory encountered, who was not the friend with which Gregory had spoken, checked the receipt and removed the security tag. When Gregory indicated that she wanted to walk around the store with the bagged bedding set, the employee stepped in front of Gregory and said, "Well, why don't you just leave it here. I'll hold it for you." When Gregory stepped to the side to avoid the employee and walk past her, the employee moved to step back in front of Gregory. After Gregory protested, the employee gave Gregory the option of leaving the item with her or taking the item to Gregory's vehicle. Gregory left the item with the employee and walked around the store. Gregory then retrieved the bagged bedding set and left the store without incident.

There is no evidence that Gregory intended or attempted to purchase anything at the Dillard's store during this particular visit. After the Dillard's employee stepped in front of Gregory, Gregory told the employee that "she is going to look at this one thing and *then I'm going to leave*." (Emphasis added). After leaving the bag with the employee, Gregory testified that she was "really annoyed." She then testified, "I don't even think I made it all the way around – I don't know what I was going to go look for, but I know a [sic] took a few steps and I came back and I took my bag and I left."

### 3. April 7, 2001

In her complaint, Gregory alleges that she visited the Dillard's store on April 7, 2001, and was "followed" while at the store. In her deposition, Gregory testified that she has no recollection of any person that followed her. Gregory further testified that she cannot remember how she was followed, what department she was in when she was followed, or where she was followed.

### C. Jeff McKinney

McKinney's claims are based on one incident at the Dillard's store in Columbia, Missouri. The incident occurred in the summer of 2000.

McKinney and his two cousins went to the Dillard's store to shop for cologne. Upon arrival at the Dillard's store, McKinney and his cousins immediately went to the cologne counter. A sales associate was about 4 to 6 feet away when they arrived at the cologne counter. McKinney made eye contact with the sales associate about 5 seconds to a minute after he and his cousins arrived. The sales associate was not helping anyone when they arrived. McKinney and his cousins did not ask for help when they first arrived and the sales associate did not ask them if they needed any help. McKinney and his cousins then began using certain cologne testers that were located on the counter. A Caucasian customer arrived about three or four minutes later and was attended to by the sales associate. Another Caucasian customer was then attended to by the sales associate. It is undisputed that the customers went straight to the sales associate.

The sales associate eventually approached McKinney and his cousins about 15 minutes after they had arrived at the store. McKinney and his cousins made no attempt during this 15 minute time span to ask the sales associate for help or to tell her that they wanted to purchase something. When the sales associate arrived, she immediately took the testers that had been used and placed them in their original location. The sales associate never asked McKinney and his cousins if they wanted to see or purchase the cologne they had tested. One of McKinney's cousins then asked the sales associate why they had been there for almost 15 minutes without being helped. In response, McKinney claims the sales associate was "rude in her tone of voice," but cannot remember exactly what she said. One of McKinney's cousins then asked to speak to the manager. At that point, McKinney and his cousins were talking to the sales associate in a "mad tone." McKinney then told

his cousins that it was "not worth it," and they decided to leave the store. McKinney never asked the sales associate if he could purchase cologne at any point during the trip.

### D.     Michael Butler

Butler's claim is based on one incident at the Dillard's store in Columbia, Missouri. The incident occurred in the fall of 1999 or 2000.

Butler purchased some shoes from the Dillard's store. The morning after he purchased the shoes, Butler noticed that the shoes were scuffed. Butler then went to the Dillard's store to exchange the shoes.

After arriving at the Dillard's store, Butler spoke with a female sales associate and told her that he needed to exchange the shoes. The sales associate left and returned with a male sales associate. The female sales associate then asked Butler for his receipt. Butler forgot to bring the receipt. The female sales associate then stated, "Well, where did you buy those shoes?" Butler responded, "Ma'am, I bought them right here." The male sales associate then said, "Well, if you bought them right here, why don't you have your receipt," to which Butler responded he had left it at home. The female sales associate flipped open the box and the salesperson's name who sold Butler the shoes and "some kind of number" were written inside the box. The female associate said, "We don't know that you bought the shoes right here" and that Butler "could have stolen those shoes. People do that all the time and bring them in and try to get their money back." Butler told the female sales associate that he wanted to exchange the shoes for another pair. Both of the sales associates then stated they needed to get the manager. The female sales associate told Butler that he had to leave the shoes with her. Butler told the female sales associate that he paid cash for the shoes and was going to take them home. The female sales associate repeated that Butler needed "to

leave the shoes."

Dillard's continued to dispute the exchange with Butler, keeping him at the store for an hour, and refusing to accept the exchange. Butler left the store with the shoes he had brought in to exchange. Butler eventually returned to the store with the shoes and their receipt and exchanged the shoes for a new pair.

Dillard's current policy for returns/exchanges provides as follows:

> Dillard's will issue a refund in the form and amount of the original tender paid (including sales tax) or Dillard's will issue a Merchandise Credit, at the customer's choice, when each of the following conditions has been met: 1. The merchandise must be returned within thirty (30) calender days of purchase; and 2. The merchandise must be in its original, unused condition unless there is a manufacturer's defect; and 3. The merchandise must be accompanied by either the original Dillard's Receipt or the original Dillard's Proof of Purchase Label.

According to Don Edson, who is the store manager of the Dillard's store in Columbia, Missouri, the use of Proof of Purchase ("POP") labels as an alternative to a receipt for returns/exchanges did not begin at the Columbia, Missouri, store until March of 2000. A POP label is not handwritten and does not include the employee's identification number. It is a bar-coded yellow sticker. The POP label is scanned and put on the item when the purchase is made and can be removed or fall off the item. Prior to March of 2000, a customer in the Columbia, Missouri, store was required to present a receipt to return/exchange merchandise.

Rick Beasley was an employee of the Dillard's Store in Columbia, Missouri, from 1996 to 1999. In his deposition, Beasley testified that Dillard's policy for returns/exchanges during the time period in which he worked required the customer to furnish a receipt to return/exchange the merchandise. When asked if he ever witnessed "somebody allowing a Caucasian to return something without a receipt," Beasley responded "Oh, yeah." Beasley testified that African American customers were denied returns/exchanges in the absence of a receipt.

Maren Snell was an employee of the Dillard's store in Columbia, Missouri, from July 2001 to December 2001. Thus, Snell was an employee at Dillard's after the POP policy had been initiated. In her deposition, Snell testified that she observed Dillard's employees instruct African-American customers to furnish a receipt for merchandise that contained a POP label during an attempted return/exchange. When asked if Snell ever witnessed a "white customer being asked for a receipt," Snell responded, "No."

### E. Cecilia Young

Young's claim is based on one incident at the Dillard's store in Columbia, Missouri. The incident occurred in the summer of 2000.

Young had spent several hours shopping in the Dillard's store. She made an initial purchase in one of the departments in the amount of $200.00, for which she paid with a check. There was no problem processing the check. At the end of the day, when the store had closed, Young attempted to make a second purchase with a check in the amount of $600.00. The sales associate assisting Young accepted the check, but when the check was "run through" the system, the check was declined. The sales associate did not know why the check was declined and was apologetic. The sales associate then called for a manager to see if the manager could override the system. Young does not know if the manager "refused to come or what happened. I know they did not come. I heard [the sales associate] asking or appearing to ask them to come for assistance and they did not come."

Young decided to leave the store. The sales associate set aside the merchandise Young selected so she could purchase it later. Upon leaving the store, Young was provided a toll free number she could call to inquire as to why her check was declined. Young called the number and

spoke to an individual who advised her of a dollar limit that was in place at Dillard's. Young also learned that the check was declined by a company other than Dillard's. Young returned the next day and purchased the merchandise that had been set aside.

**II.     Standard**

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to establish the absence of a genuine issue of material fact. Dush v. Appleton Elec. Co., 124 F.3d 957, 963 (8th Cir. 1997). "Once the moving party shows that there are no material issues of fact in dispute, the burden shifts to the nonmoving party to set forth facts showing that there is a genuine issue for trial." Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). In deciding a motion for summary judgment, the Court must view all facts and inferences from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

**III.    Discussion**

    **A.      MHRA**

Alberta and Carla Turner, Crystal Gregory, and Jeff McKinney assert, or arguably assert, claims pursuant to Section 213.065 of the MHRA. Mo. Rev. Stat. § 213.065. Section 213.065 of the MHRA prohibits discrimination on the basis of race in "any place of public accommodation." Id.; *see also* Missouri Comm'n on Human Rights v. Red Dragon Restaurant, Inc., 991 S.W.2d 161, 167 (Mo. Ct. App. 1999) ("[T]he general purpose of the act is to prevent *anyone* in the state of

Missouri from being refused public accommodations because of discriminatory attitudes."). No Missouri court has determined whether a retail store such as Dillard's is a "place of public accommodation." Therefore, in analyzing this issue, the Court turns to decisions addressing Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, which also prohibits discrimination on the basis of race in "any place of public accommodation." Id. § 2000a(a); *see also* VanKempen v. McDonnell Douglas Corp., 923 F. Supp. 146, 149 (E.D. Mo. 1996) ("[D]ecisions under federal discrimination laws are authoritative under the MHRA as well as federal law, where the Missouri Supreme Court has not spoken on an issue."); Red Dragon, 991 S.W.2d at 168 ("When Missouri has not addressed an issue under the MHRA, Missouri courts may look to federal decisions interpreting similar civil rights laws.").

    Both the MHRA and Title II define a "public accommodation" in part as:

    Any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment [.]

42 U.S.C. § 2000a(b)(2); Mo. Rev. Stat. § 213.010(15)(b). "The clear implication of [the provisions] is that Congress [and the Missouri Legislature] did *not* intend to include retail establishments - - thus the need to make clear that restaurant type facilities within a retail establishment were covered under 42 U.S.C. § 2000a(b)(2) [and Mo. Rev. Stat. § 213.010(15)(b)]. If retail establishments were also intended to be covered, there would be no need for [the provisions.]" Priddy v. Shopko Corporation, 918 F. Supp. 358, 359 (D. Utah 1995); *see also* Gigliotti v. Wawa, Inc., 2000 WL 133755, at * 1 (E.D. Pa. Feb. 2, 2000) (retail stores are not places of public accommodation); McCrea v. Saks, Inc., 2000 WL 1912726, at * 2 (E.D. Pa. Dec. 22, 2000) (same); Chu v. Gormans, Inc., 2002 WL 802353, at * 4 n.3 (D. Neb. Apr. 12, 2002) (same). Summary judgment is granted in favor of Dillard's as to

plaintiffs' MHRA claims.

**B.	Section 1981**

All of the plaintiffs assert claims pursuant to 42 U.S.C. § 1981. The parties stipulate, and the Court agrees, that this case is governed by the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989); Hampton v. Dillard's, Inc., 247 F.3d 1091, 1107 (10th Cir. 2001); Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 869 (6th Cir. 2001). Plaintiffs must first establish a prima facie case of discrimination. McDonnell, 411 U.S. at 802. To establish a prima facie case of discrimination under Section 1981, plaintiffs must show: (1) that they are members of a protected class; (2) that Dillard's intended to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity defined in § 1981. Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004); Daniels v. Dillard's, Inc., 373 F.3d 885, 887 (8th Cir. 2004); *but see* Christian, 252 F.3d at 872 (adopting different prima facie test). Section 1981 provides that all persons must have the same right to 'make and enforce contracts' and the right to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" Bediako, 354 F.3d at 839 (quoting 42 U.S.C. § 1981(a)-(b)). Once plaintiffs establish a prima facie case, Dillard's must articulate some legitimate, non discriminatory reason for its actions. McDonnell, 411 U.S. at 802. If Dillard's satisfies its burden, plaintiffs must then present sufficient evidence to demonstrate that the proffered reason is a merely pretext for discrimination. Id. "The ultimate question of law is whether the evidence is sufficient to create a genuine issue of fact as to whether the defendant intentionally discriminated against the plaintiff." Carter v. St. Louis University, 167 F.3d 398, 401 (8th Cir. 1999).

### 1. The Turners & Crystal Gregory

Except for one claim asserted by Gregory, the remaining claims of the Turners and Gregory amount to discriminatory surveillance. "[D]iscriminatory surveillance . . . on its own [is] not actionable under § 1981." Hampton v. Dillard's, Inc., 247 F.3d 1091, 1109 (10th Cir. 2001); *see also* Garrett v. Tandy Corp., 295 F.3d 94, 101-102 (1st Cir. 2001). Allowing the Turners and Gregory to proceed on a theory of discriminatory surveillance "would come close to nullifying the contract requirement of Section 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts." Lewis v. J.C. Penney Co., 948 F. Supp. 367, 371-72 (D. Del. 1996). The Eighth Circuit has made clear that "Section 1981 does not provide a general cause of action for race discrimination if in fact it occurred." Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001). Summary judgment is granted in favor of Dillard's as to plaintiffs' claims of discriminatory surveillance in violation of § 1981.

The one claim asserted by Gregory that does not rely on a theory of discriminatory surveillance is the claim based upon the security tag incident. "[A] § 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities." Hampton, 247 F.3d at 1104; Youngblood, 266 F.3d at 854-55 (requiring interference with "contractual relationship"). Gregory fails to demonstrate an interference with an actual contractual interest or relationship. There is no evidence that she intended to purchase merchandise at Dillard's during the day of the incident. Moreover, there is no evidence that Gregory attempted to purchase merchandise and was thwarted in her attempt to purchase merchandise. Summary judgment is granted in favor of Dillard's as to Gregory's final claim of discrimination in violation of § 1981.

### 2. Jeff McKinney

McKinney's claim must fail because there is no question of material fact as to the contractual element of his prima facie case. To proceed with a § 1981 claim, "there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping." Hampton, 247 F.3d at 1118. McKinney made no attempt to purchase cologne from the sales associate. He voluntarily left the store after being subjected to what he believed to be rude behavior. Because McKinney did not attempt and therefore was not denied an opportunity to enter into a contract, and because McKinney chose to leave the store of his own accord, Dillard's cannot be held liable under § 1981. Bagley v. Ameritech Corp., 220 F.3d 518, 521-22 (7th Cir. 2000).

McKinney further argues that the 15 minute delay, in and of itself, is actionable under § 1981. "[M]ere delay, even coupled with discourteous treatment, poor service, or racial animus, is insufficient to sustain a § 1981 claim." Bentley v. United Refining Co. of Pennsylvania, 206 F. Supp. 2d 402, 406 (W.D.N.Y. 2002); *see also* Robertson v. Burger King, 848 F. Supp. 78, 81 (E.D. La. 1994). Summary judgment is granted in favor of Dillard's as to McKinney's § 1981 claim.

### 3. Cecilia Young

Young cannot establish a prima facie case of discrimination. She claims that *Dillard's* prevented her from making a purchase by not taking her check. She further claims the reason for said denial was racial discrimination. It is undisputed that the check at issue in this case was declined by a company *other than Dillard's*. Accordingly, Dillard's could not have intended to discriminate against Young on the basis of her race or prevented her from making a purchase because Dillard's had nothing to do with the denial of the check. Summary judgment is granted in favor of Dillard's as to Young's § 1981 claim.

### 4. Michael Butler

In contrast to the other plaintiffs in this case, Butler can establish the contractual element of his § 1981 claim. Butler purchased shoes from Dillard's. The ability to return/exchange the shoes for another pair of shoes is a "benefit, privilege, term, and condition" of the contractual relationship between Butler and Dillard's. 42 U.S.C. § 1981(b). Butler was denied that aspect of the contractual relationship when he was initially denied the ability to return/exchange his shoes. The fact that he was later able to return/exchange the shoes is irrelevant given the evidence of discrimination that will soon be discussed. *See* Hampton, 247 F.3d at 1105-07.

The Court finds that there are material issues of fact in regard to the ultimate question of intentional discrimination that must be resolved by a jury. Dillard's posits that Butler was thwarted in his initial attempt to exchange the shoes because he did not have a receipt. Once he was able to furnish his receipt, Butler was able to exchange the shoes. Butler, in rebuttal, presents evidence from two former Dillard's employees who testified that African Americans were treated differently than Caucasians with regard to returns/exchanges at the Dillard's store. The evidence presented by Butler is sufficient to allow his § 1981 claim to proceed to trial. Id. at 1107-10; *see also* Youngblood, 266 F.3d at 858-59 (Arnold, J., dissenting); Scott v. Macy's East, Inc., 2002 WL 31439745, at *5 - *6 (D. Mass. Oct. 31, 2002). Accordingly, summary judgment is denied as to Butler's § 1981 claim.

### IV. Conclusion

Based on the foregoing, it is hereby

ORDERED that Dillard's Motion for Summary Judgment Against Plaintiffs Alberta and Carla Turner (Doc. # 68) is granted. Alberta and Carla Turner are dismissed from this lawsuit. It

is further

ORDERED that Dillard's Motion for Summary Judgment Against Plaintiff Crystal Gregory (Doc. # 70) is granted. Crystal Gregory is dismissed from this lawsuit. It is further

ORDERED that Dillard's Motion to Strike Affidavit of Theresa Cain (Doc. # 88) is denied as moot. It is further

ORDERED that Dillard's Motion to Amend January 3, 2005, Order and to Dismiss Plaintiff Jeff McKinney or in the Alternative for Summary Judgment (Doc. # 161) is granted in part and denied in part. Dillard's Motion to Amend is denied. Dillard's Motion for Summary Judgment is granted. Jeff McKinney is dismissed from this lawsuit. It is further

ORDERED that Dillard's Motion for Summary Judgment on the Remaining Claims Asserted by Michael Butler, Deidra Golphin, and Cecilia Young (Doc. # 163) is granted in part and denied in part. Cecilia Young is dismissed from this lawsuit. Michael Butler's claim remains pending for trial.

/s/Scott O. Wright
SCOTT O. WRIGHT
Senior United States District Judge

Dated: 7-22-05